## Spencer and Newbold's Appeal.

80   317
190   564

80      317
214     ⁶519

1. Land was conveyed to Newbold and another, to hold in trust, in undivided twelfths, Smith owning two-twelfths; the trustees were authorized, on the request of a majority of the *cestuis que trust*, to sell the land discharged from the trust and divide the proceeds proportionably amongst them : *Held*, that Newbold assumed all the duties and obligations of a trustee at the inception of the title.

2. Smith, being the owner of one share in 1841, sold it by parol to Newbold, who paid the purchase-money ; no deed was ever made.   In 1855, after Smith's death, the land was conveyed, by the authority of a majority of the *cestuis que trust*, to an improvement corporation, the stock being proportionally divided; the shares of stock representing one-twelfth " to be delivered to the trustees for the owner thereof:" *Held*, that Newbold held the stock as trustee for Smith's representatives, as he had held the share of the land.

3. In 1869 Newbold obtained for Spencer from Smith's widow and heirs conveyances of all their *interest in the land*, without disclosing his purchase from Smith, or that the land had been converted, or the value, or other circumstances: *Held*, that Newbold being trustee for Smith's representatives and agent for Spencer the conveyances could not stand.

4. A trustee purchasing from his *cestui que trust* must show that he made the fullest disclosures of all he knew as to the subject and that the price he paid was adequate.

.5. There cannot be a valid parol sale of land amongst tenants in common in possession.

6. The bill averred that the plaintiff owned the land as representative of Smith ; the answer averred that Newbold had bought it from Smith and received a written title, which he had lost.   On the hearing, Newbold, as a witness, said he could not say that he ever had a deed, &c.: *Held*, the defendant's own testimony being in conflict with the answer, that it was not conclusive, and it was insufficient to prove the execution of a deed.

7. The effect of a party's testimony in conflict with his answer is to impeach and overthrow the answer.

January 11th 1876.   Before AGNEW, C. J., SHARSWOOD, MER-
CUR, GORDON, PAXSON and WOODWARD, JJ.

Appeal from the decree at Nisi Prius: Of July Term 1870,
No. 23.   In Equity.

The bill in this case was filed June 8th 1870, by Louisa V.
Smith, against Howard Spencer, William M. Spencer, John L.
Newbold and The Black Creek Improvement Company.   By leave
of the court an amendment to the bill was filed December 15th
1870 and another September 27th 1871.   The bill set out :—

1.  By deed of January 11th 1836, William L. Newbold con-
veyed to defendants, William M. Spencer and John L. Newbold,
five tracts of land in Sugar-loaf township, Luzerne county, in trust
for various persons, amongst whom was Nathan Smith, his interest
being two undivided twelfths.

2.  By deed of June 1st 1837, Nathan Smith and wife conveyed
to John L. Newbold one-half his interest.

3.  Nathan Smith died June 17th 1849 intestate, still owning
one-twelfth, leaving to survive him his widow the plaintiff, a son,
Sidney V. Smith, and two grandchildren, Sidney V. Stratton and
Mary Stratton.

4.  The defendants William M. Spencer and John L. Newbold
as trustees, on the 22d of January 1855, conveyed part of the
tracts to the defendants, The Black Creek Improvement Company,
for shares of stock of that company.

5, 6.  In consequence of this conveyance, the plaintiff, her son
and two grandchildren, above mentioned, became entitled to one-
twelfth of the stock.   Mary Stratton died October 17th 1863 and
her interest in the stock and dividends vested in her brother, Sid-
ney V. Stratton.

7.  On the 31st of January and 1st of March 1870, all the
interest of Sidney V. Smith and Sidney V. Stratton was assigned
to the plaintiff.

8.  The plaintiff therefore became entitled to about 4083 shares
of stock and the dividends declared on them.

9.  The company on the 8th of February 1870, issued to W. M.
Spencer and J. L. Newbold a certificate for 3500 shares, and no
certificate had been issued for the remaining 583 shares.

10.  The plaintiff, on the 18th of May 1870, had requested W.
M. Spencer and J. L. Newbold, trustees, &c., to transfer the shares
and pay her the dividends which had come into their possession;
Newbold declined on the ground that the stock was claimed by
the defendant Howard Spencer.

11.  She had requested the company to issue her a certificate for
the 583 shares and pay her the dividends.

12.  Howard Spencer falsely claimed to be entitled to the stock
and had demanded of the other defendants that a certificate be
issued to him.

13. (1st Amendment.) Early in 1869, Newbold, acting for Howard Spencer and in concert with him, by concealment of his purpose and without disclosing to plaintiff that the one-twelfth interest in the land had been converted into a like interest in stock, and assuring her that neither she nor her son nor her grandson had any substantial interest, and not giving her any information on the subject, fraudulently induced her, in the absence of any adviser, for $3000 to convey to Howard Spencer all her interest in the lands in the townships of Foster, Dennison, Hazle and Butler, in Luzerne county, and to procure from her son and grandson conveyances of all their interest, &c., in those lands to Howard Spencer, with the fraudulent intention thus to secure to Howard Spencer a title, &c., to the stock. At the time of the conveyances and for a long time afterwards neither she nor her son nor grandson had any knowledge that such right, either in land or stock, belonged to them; and Newbold, though trustee, gave her and them no information, but studiously concealed their interest.

14. (2d Amendment.) Newbold having claimed that in 1841 he had purchased from Nathan Smith his one-twelfth interest in the lands (which plaintiff denied), if such purchase was made she was entitled to the share in the stock which she claimed, because on the 5th of January 1854, a sheriff's deed for all Newbold's interest in the lands conveyed to the company was made to T. M. Mitchell, who, on the 15th of May 1854, conveyed the same to George H. Thomson, who died in 1863, and whose executrix and sole legatee conveyed it on the 24th of May 1871 to the plaintiff.

The prayers were :—

1. For discovery.

2. Against W. M. Spencer and Newbold for an account and for a transfer of the stock and dividends belonging to the one-twelfth interest.

3. Against the company for an account and for a transfer of the stock and dividends and a decree to permit W. M. Spencer and Newbold to transfer the stock to the plaintiff.

4. That Howard Spencer be enjoined from making any claim to the stock or dividends.

5. For other relief.

The answer of The Black Creek Improvement Company was filed October 3d 1870.

Amongst other things the answer stated that the one-twelfth interest in question was represented by 3500 original shares and 583 shares of reserved stock and by $3604.70, the amount of three dividends declared before the filing of the bill, and $1020.75, one dividend declared since ; that a certificate for 3500 shares was issued February 8th 1870, to W. M. Spencer and J. L. Newbold, trustees, and that the 583 shares had not been issued nor the cash dividends paid, but they stood on the books credited to " one-

twelfth original;" that the company were simply stakeholders and not interested in the result, and prayed to be reimbursed out of the fund for expense, &c., incurred by them in the litigation.

John L. Newbold by his answer, denied that Nathan Smith at the time of his death or the plaintiff and her children afterwards were entitled to the one-twelfth interest; averred that he (Newbold) had purchased it from Nathan Smith in his life. He averred that Nathan Smith, by deed of January 11th 1836, became entitled to two-twelfths of the trust estate; that in the following year he purchased from Smith one-twelfth and sold it in 1854. In March 1841, Smith sold him one-twelfth for $700, its full value, which he paid; that until the 22d of January 1855, when the land was converted into stock, he publicly exercised all the rights of ownership over the interest, paid the proportion of taxes from 1841 to 1855, and that Smith from 1841 until his death never claimed or exercised any rights of ownership; from 1841 to 1855 the title to the land was in the trustees, and Newbold held for himself without question from Smith or any one; that after the conversion, W. M. Spencer and Newbold held the one-twelfth in trust for Newbold as the owner, and as such he was elected a director in 1855 and so continued for a number of years; his claim of such ownership was known to the directors, but he was unable to produce his written title; "he did receive such title from Smith at the time he made the purchase, but had lost or mislaid it." He had not then the proofs of his purchase and title, he averred he was ready to produce them in evidence. On the conveyance of the land, the directors ordered 38,500 shares to be transferred to the owners of eleven-twelfths of the interest and 3500 shares to a trustee for the owner of the remaining twelfth; Newbold claimed the 3500 shares; he averred that they belonged to Howard Spencer who was entitled to the 583 shares and the dividends. Smith died insolvent, largely indebted to Newbold, who, at the time of the conveyance to the company, held a judgment against him, which would have been a lien on any interest Smith might have had in the land; Newbold, relying on his purchase, did not levy on this interest. Howard Spencer was a director and secretary and treasurer of the company; he knew of Newbold's claim of the one-twelfth, his payment of taxes, &c. In 1868 Newbold sold this interest to Howard Spencer, who requested him to obtain quit-claim deeds from the widow and heirs of Smith; Howard Spencer authorized Newbold to pay $3000 for that purpose. After interviews with plaintiff an agreement under seal was made by her with Howard Spencer, by which she agreed to release " her dower, right, title and interest in any tracts of land in the townships of Foster, Dennison, Hazle or Butler in Luzerne county, owned or claimed by the said Nathan Smith," &c., and covenanted to use her best endeavors to procure from her son and grandson, heirs of Smith,

a quit-claim deed to Howard Spencer for their right in those lands, Howard Spencer to pay $3000 on the delivery of her release and the quit-claim deeds. Plaintiff then knew that her husband owned lands and admitted in her bill that she had joined in conveying to Newbold one-twelfth interest in them. Newbold told plaintiff that he had delivered to Howard Spencer a quit-claim for his own interest; he read the agreement to plaintiff before she signed it, and also the deeds to be executed by his heirs, which she agreed to forward to them; he furnished her envelopes for the deeds; she wrote to her son and grandson enclosing them, gave them to Newbold to mail, which he did; the deeds were returned to plaintiff, and her release of dower was delivered to Newbold about March 18th 1869, when he paid her $1500, which by her direction he gave to John Sparhawk, her agent, in April 1869; the other deed was delivered to Newbold; he then gave her Howard Spencer's check for $1500.

The son was a lawyer; he formerly lived in Philadelphia, and in 1841 and subsequently kept his father's books; was conversant with his father's affairs and knew of his interest in these lands; there are entries in the books in the writing of the son showing his knowledge of the purchase by Newbold from the father of the one-twelfth interest; the son had been living in California and practising law there since 1851 or 1852.

In answer to the thirteenth paragraph of the bill (1st amendment), he denied the allegations of "concert," "concealment of purpose," "fraudulent inducement," or "fraudulent purpose." He further said: In January 1869, on behalf of Howard Spencer, he visited the plaintiff, telling her he came on Howard Spencer's business; she asked if it was James S. Spencer whom she had known; he told her he was speaking of one of his sons, who had coal-lands in Luzerne county, which her husband and Newbold had once owned; that disputes had arisen about the title; Spencer wished to purchase outstanding claims; the lands were near Hazleton, Luzerne county, and had no connection with the Wurtz lands. She replied she knew her husband had owned lands there, but thought he had sold them all; Newbold said her husband had told him so before his death; Howard Spencer wished to purchase from him (Newbold) and Smith's heirs any possible right that might be in them; he wished only quit-claim deeds without any warranty, and would pay for such deeds something worth while; the lands were valuable; if it settled the title, Spencer could well afford it; no sum was named; she expressed willingness to do anything she could; he particularly explained to her that her only interest was her dower in the land; Spencer particularly wished quit-claim deeds from the heirs; she told him who they were and shortly afterwards gave him a written statement of them; he afterwards told her that Spencer would pay $3000 for her release of

30 P. F. Smith—21

dower and the quit-claim of the heirs; he told her the largest part of the money would belong to the heirs; and he hoped they would be liberal to her; she said they would; he asked her to advise with her business friends; she said since the death of Charles Wurtz, she had no one to consult but her son in San Francisco; Newbold told her that her son was the one to consult; he was a lawyer, conversant with his father's affairs, there was ample time to do it, the business could not be concluded without his sanction. On the 1st of February she executed the agreement with Spencer and received the counterpart executed by him; said she would write to her son and grandson; Newbold told her Spencer had written to her son. When he gave her Spencer's check for the first $1500 she requested him to hand it to Mr. Sparhawk to invest for her and to say nothing to him about the transaction; he enclosed the check to Sparhawk; the second $1500 were paid her by Spencer's check and she requested him to give it also to Mr. Sparhawk to be invested; he enclosed it to Sparhawk. Smith's trunks had been sent to Newbold's office at her request; he told her in March that he had examined them, and found nothing of value in them, but that Smith's books showed clearly that he had sold all his interest in the lands. At the time of the sale to Spencer and for many years before, Newbold believed that this one-twelfth belonged to him; he did not know until after the transaction was closed, when he saw for the first time a brief of title prepared by Mr. Patrick by direction of the president of the company; that the title stood on the records of Luzerne county in the name of Nathan Smith—it had been suggested that it might be in Smith, but there had been much confusion in the title of many of the shares for a number of years—when in 1868 he agreed to sell to Spencer both were ignorant how the title stood; during the negotiation with plaintiff they at one time thought it might be in the heirs of John Troubat or George H. Thomson. Newbold believing in equity that it belonged to him made a sacrificing sale to Spencer to get his aid in clearing up disputes by purchasing interfering claims; the allegation that Newbold concealed his purpose from her was "false and unfounded," she had ample time to consult her friends between the last of January and the 26th of March when the deeds were delivered.

In answer to the fourteenth paragraph of the bill (2d amendment) Newbold said, that in 1837 he sold one of his two shares to Dr. James J. Porter and one to Henry Seybert; Porter did not record his deed, and in November 1849 he conveyed his share to Thomson; he did not record either deed; Smith's deed of 1837 to Newbold was also unrecorded; Mitchell, in 1854, sold Newbold's right at sheriff's sale and became the purchaser; the effect of this sale was to divest Thomson of his title to the twelfth he bought from Porter and also to divest Newbold's title to the share deeded to him by Smith as well as the share Newbold had bought from him in 1841,

that in controversy; shortly after the sheriff's sale, Newbold learned of it and procured Mitchell to re-convey to him on the payment of $2000; Thomson lent Newbold $500 to make the payment; by Mitchell's conveyance Newbold became re-vested with his two-twelfths and also of the disputed twelfth for the use of Thomson; to secure Thomson for his loan a deed was made to him which was not absolute, but as security for the loan. On the 7th of May 1854, Pardee and Fell bought three shares through Newbold; Thomson agreed to sell one; Newbold agreed to sell the one conveyed by Smith in 1837, then held by Thomson as collateral, and Seybert agreed to sell one; Mitchell made the deed to Thomson under Thomson's direction; out of the consideration received from Pardee and Fell, Newbold paid Thomson his advance; Newbold received in all for that one share $5063. Thomson never purchased any share from Newbold nor claimed any interest in one belonging to him.

A replication was filed and the case was referred to John B. Gest, Esq., as examiner and master.

The facts as found by the master are as follows :—

The original trust deed of 1836 authorized the trustees, on the request of a majority of the *cestui que trust*, to sell the trust property discharged of the trust and divide the proceeds amongst the parties interested. Some time in the same year Robert Jarden conveyed to Nathan Smith two other twelfths, John L. Newbold also owning two-twelfths under the original trust deed. In 1837 two of the tracts were conveyed to the Sugar-loaf Coal Company. On the 1st of June 1837, Smith conveyed to John H. Newbold one of his original shares; the deed remained unrecorded until March 24th 1864; July 27th 1837 Smith conveyed to W. L. Newbold the Jarden shares; November 24th 1838, W. A. Budd conveyed to Smith half a share, which, January 25th 1839, Smith conveyed to John Troubat; he reconveyed it to Smith February 1st 1840, and May 11th 1840 Smith conveyed it to James S. Spencer; all the deeds executed by Smith were witnessed by his son, Sidney V. Smith. The record shows no deed of any purchase or sale by Smith since this conveyance to James S. Spencer. There were numerous sales and changes of ownership up to the formation of The Black Creek Improvement Company; at that time, according to the record, the only share in the name of any original *cestui que trust* was that in the name of Nathan Smith, the one now in dispute.

J. L. Newbold and Smith were connected by marriage and had for a long time been intimate and extensively engaged in speculations; they were negligent in conducting their business; both became insolvent in 1841 and so continued. At the time of Smith's death in 1849, he was largely indebted to J. L. Newbold. The books of Smith produced in evidence in 1841 and previously

were in the handwriting of his son; subsequently they were in the handwriting of Smith himself.

In an account in the day-book, headed "Black Creek Coal Company," are these items:—

"March 4th 1841.—Cash Dr. to Black Creek Coal Co. 1 share sold to J. L. Newbold,—$700."

"March 17th 1843.—Profit and loss. Dr. to sundries. Black Creek Coal Co. Gave my interest to J. and W. L. Newbold for adjustment of old accounts. I did not think there was any more value in it,—$2520."

In Smith's cash-book the $700 are entered in Smith's handwriting as actually received.

The master therefore found that Smith in March 1841, sold the share in dispute to J. L. Newbold for $700, and received the purchase-money.

Newbold as one of the trustees paid taxes on all the lands from the beginning to the transfer to The Black Creek Company and apportioned the amount amongst the several owners. Newbold testified that after 1849, the time of Smith's death, he paid the taxes on Smith's share on his (Newbold's) own behalf. Apportionments produced by him for the taxes paid in 1844, 1846 and 1848 did not show Smith's name, although during those periods the record title of the share in dispute was in Smith.

Some time after the agreement of February 1st 1869, a trunk containing papers of Nathan Smith was sent at the plaintiff's instance to Newbold; she had previously requested him to examine the papers to ascertain if there were evidences of ownership of property by Mr. Smith. Newbold returned the trunk in April or May following, retaining two papers which were in it; he testified that when he returned the trunk, he did not know that he had the papers out. One of the papers was a contract relating to some Richmond lots. The other was endorsed, "Owners of Black Creek."

This paper contained a list of names as follows:—

| | |
|---|---|
| " H. Seybert, | 3 |
| J. S. Spencer, | 2 |
| A. G. Waterman, | 1 |
| W. Trotter, | 1 |
| Dr. Porter, | 1 |
| Troubat, | 1 |
| W. L. N.—J. L. N., | 3 |
| | 12 " |

The list was in the handwriting of J. L. Newbold; the endorsement was in the handwriting of Smith.

The names of the owners and the numbers opposite their names

agree with the apportionment of taxes by Newbold in 1844. Except that in the apportionment, the entries are " W. L. New- bold 1½," " J. L. Newbold 1½," instead of the initials as in the list.

The master was of opinion that this paper unexplained was not an admission that Smith had no interest in the property in 1844.

The master found the transactions in relation to the sheriff's sale under Mitchell's execution against Newbold, and the convey- ance to Thomson, &c., substantially as stated by Newbold in his answer; that two shares, undoubtedly Newbold's, passed by the sheriff's sale and also the share in dispute, if it was then vested in Newbold, and that the title held by Thomson by virtue of Mitch- ell's deed to him was solely the appointment of Newbold and for his own use.

On the 1st of February 1869, Newbold executed and delivered a deed to Howard Spencer. It recited an agreement made in 1841 between himself and Smith by which Smith agreed to sell him for the consideration of $700 a twelfth of three tracts of land in Lu- zerne county, and that Smith died *without executing to him a deed*, although the consideration money had been paid to him; and in consideration of " one dollar * * * and for other good causes and considerations," conveyed to Spencer all his " right, title and inter- est" in this share, Newbold stipulating that he should not be " lia- ble to make good the title to the premises, but only to transfer to Howard Spencer all my right, title and interest therein."

Newbold in his testimony stated he believed Smith made him a deed for the share in dispute; he had searched for it for years and had never been able to find it. He would not like positively to say that a deed was made to him by Smith, but his belief was that there had been.

On cross-examination, in answer to the question, who wrote the deed which he thought he had for the share in dispute, he said, " I don't know that any deed was ever written, and of course I can't say who wrote it. I have no recollection on the subject." At a subsequent cross-examination, he said that he had not found any instrument of writing of Smith relating to the share in dispute; that he could not say certainly that any such instrument was ever executed; he believed that there was; he had a distinct recollection of making the purchase and paying for it, but no recollection whether he got a deed or written agreement or not for it, but believed that he had and had lost it.

After the organization of The Black Creek Company and the conveyance of the trust land, certificates were issued for 38,500 full paid shares to the owners of eleven-twelfths of the property; 3500 shares were directed to be delivered to W. M. Spencer and J. L. Newbold in trust for the owner of the remaining twelfth; about three years afterwards the reserved stock was directed to be dis-

tributed *pro ratâ* amongst the stockholders. After the quit-claim deeds of Smith's widow and heirs to Howard Spencer, he claimed to have the stock representing the disputed one-twelfth issued to him. On July 13th 1869, a committee on the subject reported that the plaintiff had served a notice on the company, not to issue the stock to any one but herself and the heirs of Smith. On the 8th of February 1870, the directors ordered that 3500 shares be issued to W. M. Spencer and J. L. Newbold ; they were so issued and remained in the name of those trustees; the 583 of reserved stock continued credited on the books to " one-twelfth original."

The dividends declared by the company, up to July 15th 1872, were equal to $2.20 per share.

The master found the transactions with Mr. Smith substantially as set out in the pleadings. The real consideration for the deed of Feb. 1st 1869, from Newbold to Howard Spencer, heretofore refer-red to, originally was that Spencer should advance whatever might be necessary to pay for any outstanding record title, so as to secure the issuing the stock for the one disputed share and then divide equally between them the remaining balance. This agreement as to the consideration was afterwards modified, so that Spencer was to have the stock at $4 per share ; and after deducting the amounts expended, the balance was to be divided between them. They thus became partners in the transaction. The deeds from plaintiff and the heirs to Spencer described the property as " certain tracts of land in the townships of Foster, Dennison, Hazle or Butler," these being the names of townships formed out of the old township of Sugarloaf.

Newbold never informed plaintiff that the land had been con-verted into stock and he said nothing to her about the Black Creek Improvement Company ; neither she nor the heirs knew anything of this company or of the conversion of the land. The plaintiff was eighty-two years of age at the time of her agreement. For nine or ten years John Sparhawk had attended to her pecuniary affairs and held powers of attorney from her. On the day he received the second check she told him only that the money came from land of her late husband ; Newbold had previously told him that the money arose from the sale of a claim of her husband and heirs. Mrs. Smith had joined her husband in conveyances of interests in the land in 1837, 1839 and 1840 and therefore knew of the property and how it was held.

During the negotiations with plaintiff, both Newbold and Spencer were uncertain whether the title to this share was in Smith's heirs, or in Troubat or Thomson. Mrs. Smith made no inquiry as to the matter until after she had received the considera-tion in the end of March. In her letter dated March 29th 1869 to her son, she told him that Mr. Newbold, an old friend of his

father, had negotiated the sale of some lands she owned in Luzerne county, &c., and that the son's agreement was necessary. The son, having kept his father's books and having himself made the entry of "share sold J. L. Newbold $700," must have known of the father's interest in the property in question; he testified that he did not believe he knew of his father having owned the property in question; if he had known he had forgotten it. If Smith died seised of one share of this land, the plaintiff's dower interest at the time of the agreement was worth about $3000.

The master found in conclusion:—

"1. That Smith on the 4th of March 1841, sold this share to Newbold for $700, which at that time was a fair price for it.

"2. That Newbold acquired from Smith no title to the share that would avail him either as against the Statute of Frauds or under the Statute of Limitations.

"3. That Spencer was affected by the imperfections of Newbold's title and that the conveyance from Newbold to him gave him no better title than Newbold had; they were partners in the share.

"4. The stock at the time of the execution of the plaintiff's transfer to Spencer was worth from $16,000 to $30,000. The stock having arisen from the sale of land, a deed for the grantor's whole right and interest in the land would pass the stock; Newbold stood in a fiduciary relation to the plaintiff and the heirs; it was his duty to disclose the change in the condition of the property; even if there had been no other change than the great increase in value, he was bound to disclose that as well as the fact that when he was ostensibly buying for another he was himself interested in the purchase; Spencer having made the trustee his agent was affected as Newbold was and was in no better position than he. The deeds from the plaintiff and heirs to Spencer were not good as deeds of confirmation of the sale made by Smith to Newbold in 1841. If as confirmation, the grantors should have been informed of the circumstances which required a confirmation and they having no such information, the deeds were no more effective under the circumstances as a confirmation than as original conveyances. Besides no estate at all having passed the parol sale from Smith to Newbold there was nothing on which the confirmation could operate.

"5. The indebtedness of Smith to Newbold had no other bearing than to explain the motives and acts of the parties and as a reason why Newbold might have believed that he was entitled to the transfer that he had obtained. The indebtedness could not in any way affect the title to the share in the land or stock."

The master therefore decided that "the release of dower and quit-claim deed from the widow and heirs of Nathan Smith are invalid, and passed no interest in the stock in question to Howard Spencer; they must therefore be given up and cancelled or a reconveyance be ordered."

[Spencer and Newbold's Appeal.]

He was further of the opinion that the $3000 paid by Spencer should be repaid to him; the costs of suit to be paid by those defendants interested in the purchase; The Black Creek Improvement Company being stakeholders to be paid $306.60 expenses incurred by them from the litigation.

He recommended a decree as follows :—

1. That the defendants, Willian M. Spencer and John L. Newbold, trustees, be ordered and decreed to transfer to the said plaintiff, all shares of stock of the said The Black Creek Improvement Company, standing in their names as trustees, and belonging to or produced by the said one-twelfth equitable interest of the said Nathan Smith, deceased, in the lands conveyed to The Black Creek Improvement Company.

2. That the defendants, The Black Creek Improvement Company, be decreed to account for and transfer, or to permit the said trustees to transfer to the said plaintiff, all the shares of stock on the books of the said company credited to the said one-twelfth original share of the said Nathan Smith, deceased.

3. That the said defendants, The Black Creek Improvement Company, be ordered and decreed to pay to the said plaintiff, all dividends standing on the books of the said company to the credit of the said shares of stock produced by or belonging to the said original one-twelfth share of said Nathan Smith in said lands.

4. That the said plaintiff be ordered and decreed to pay to the said defendant, The Black Creek Improvement Company, out of the said dividends at the time of the payment thereof, the sum of $306.60, for the expenses incurred by the said The Black Creek Improvement Company in this suit.  And that said plaintiff do further pay out of the said dividends, to Howard Spencer, the sum of $3000, with lawful interest thereon, from the 26th day of March A. D. 1869, to the time of such payment.

5. That the said Howard Spencer be perpetually enjoined from at any time setting up or making any claim to the said shares of stock resulting from the aforesaid one-twelfth interest, lately belonging to Nathan Smith, deceased, or to any interest therein or portion thereof, or the dividends thereon, beyond the said sum of $3000, and interest thereon.

6. That the said Howard Spencer (on the repayment to him of the sum of $3000, with interest, as aforesaid) be directed to reconvey to the said widow and heirs of the said Nathan Smith, the premises released and conveyed to him by them.

7. That the said defendants, Howard Spencer and John L. Newbold, pay the costs of this suit.

The plaintiff and Howard Spencer and John L. Newbold, defendants, filed exceptions to the master's report.

The plaintiff's exceptions were to the master's findings of fact

and reporting that the plaintiff was bound to repay to Spencer the $3000 paid by him.

The defendants excepted to the master's findings of facts, and his conclusions of law; also to the decree recommended by him.

The court at Nisi Prius (Mr. Justice SHARSWOOD) dismissed the exceptions and entered the decree recommended by the master.

The plaintiff and defendants respectively appealed to the Supreme Court in banc; and assigned the overruling of their exceptions and entering the decree for error.

*G. W. Biddle* and *H. M. Phillips* (with whom were *G. Biddle* and *D. Webster*), for Spencer and Newbold.

*R. N. Wilson*, for Smith.

Mr. Justice MERCUR delivered the opinion of the court, May 8th 1876.

In the lifetime of Nathan Smith, he was entitled to an undivided one-twelfth part in certain coal-lands. The legal title to the land was in John L. Newbold and William M. Spencer. The widow of Smith filed this bill, alleging that Newbold, acting for himself and Howard Spencer, fraudulently procured from her, and from the heirs of her late husband, a conveyance of this interest in the lands. The master found the allegations to be true. The court sustained the finding. Thereupon, *inter alia*, it decreed a transfer to Mrs. Smith of the property in its changed form, on the payment to Howard Spencer of the sum which he and Newbold had paid, with interest. From this decree each party appealed.

The controlling questions for consideration are, whether Newbold held the property in trust at the time of procuring this conveyance, and if so, did he conceal from Mrs. Smith the true condition of the title and property to such an extent as to be guilty of fraud in its procurement?

In 1836, five tracts of land, situate in Luzerne county, were conveyed to William M. Spencer and said Newbold, in trust as to certain undivided twelfth parts or shares thereof, for the use and benefit of themselves and of several other persons therein named, and *inter alia* two-twelfths thereof for said Nathan Smith. A proviso in the deed authorized said trustees at any time on the request in writing of a majority in number and in trust of the *cestuis que trustent*, to sell and convey the premises discharged of the trust, and to divide the proceeds among the *cestuis que trustent* in the proportion in which they held the shares in the land. Thus Newbold assumed all the duties and obligations of a trustee at the inception of the title.

Subsequently these shares or twelfths were the subject of sale and purchase. Nathan Smith bought and sold several shares.

[Spencer and Newbold's Appeal.]

Finally, in 1841, he appears to have been the owner of one share or twelfth only.    He died in 1849.

In 1854, The Black Creek Improvement Company, one of the defendants below, was incorporated by an Act of the Legislature. John L. Newbold was therein named as one of the incorporators. By deed of 22d January 1855, Spencer and Newbold, said trustees, conveyed to said company defendant, three of said tracts of land, being all that remained unsold, having been authorized and required so to do by a majority in number and in trust of the *cestuis que trustent* in the property.    In May of the same year, certificates of shares of full paid stock were directed by the company to be issued to the owners of eleven-twelfths of the property, and 3500 shares of the stock to be delivered to William M. Spencer and John L. Newbold, trustees, for the owner or owners of the remaining one-twelfth.    In July 1869 Mrs. Smith notified the company " not to issue the stock to any but herself and the heirs of Nathan Smith, deceased."    Nevertheless, in February 1870, the company did issue certificates for these 3500 shares of stock to William M. Spencer and John L. Newbold.

The agreement of purchase from Mrs. Smith was made in February 1869, and consummated by deeds made in the same month, and in the month of March following.

In the years 1869, 1870, 1871 and 1872 the company declared dividends in the aggregate of 22 per cent., or $2.20 per share.

It is claimed, however, by the defendants in the bill, that Newbold did not hold this share in trust at the time of his purchase from Mrs. Smith.    It is alleged that he was then the owner in his own right by virtue of a purchase made by him in 1841, of Nathan Smith.    The master thus far sustained this allegation as to find that Newbold did purchase by parol at the time alleged and paid the purchase-money.

Although the fact of purchase is stoutly denied, yet we do not see sufficient evidence to reverse this finding.    We therefore assume it to be correct.    But the master further found that Nathan Smith did not execute any deed or instrument of writing conveying the same.

This finding of fact is alleged for error inasmuch as in Newbold's answer he distinctly avers he had received a written title from Nathan Smith for the share in dispute ; that the answer was distinctly responsive to the bill, and it had not been contradicted by any witness of the plaintiff in the bill.

If the case rested on the bill and on the answer of Newbold alone, or if his subsequent testimony had not contradicted his answer, there would be great force in this defence so far as it applied to himself.    The answer, however, would not have availed Spencer, who had no knowledge of the alleged purchase, except what he received from Newbold and answered on information and belief only.    Be-

sides, in the deed from Newbold to Spencer of the 1st of February 1869, conveying this one-twelfth share to the latter, it is distinctly averred, "whereas the said Nathan Smith died without executing to me a deed for the said one-twelfth share or interest."

It is a significant fact that this deed bears the same date as the contract between Spencer and Mrs. Smith, which by a more general description included the same share. Thus it clearly appears that Spencer accepted a conveyance from Newbold of the land in question under an express declaration, that Nathan Smith had never executed a deed for said premises. As further evidencing the knowledge of the parties to the conveyance, and fully to protect Newbold, he therein declared "nothing herein contained shall be construed so as to render me liable to make good the title to the premises hereby granted, but only to transfer to the said Howard Spencer all my right, title and interest therein."

On testifying before the examiner, April 18th 1872, Newbold said, " I believe he made me a deed for it; I had searched for that deed for years; I have never been able to find it." On a further examination, May 29th 1872, he answered: "I do not know that I ever had a deed, I am strongly impressed that I had." Then to the question, "who wrote the deed which you say you are impressed you had for the share in dispute?" he answered, ":I don't know that any deed was ever written, and of course can't say who wrote it; I have no recollection on the subject."

Thus, as a witness, he frittered away on this point all certainty in his answer as a party. If, when subjected to the test of an examination, he could not swear that he ever had a deed; nor that he had ever seen one, nor that one was ever written, and that he had no recollection on the subject of a deed, it is very clear the master was correct in finding the evidence insufficient to prove the execution and delivery of a deed. We may concede the correctness of the remark made by Chancellor Green in Brown v. Buckley, 1 McCarter (N. J.) 295, as to the general effect of the answer; yet here Newbold, the witness, substantially impeached and overthrew the answer of Newbold the party.

The positive declaration made in his deed, under seal, some two years before his answer, harmonized with his solemn oath, made nearly two years after his answer. When a party is permitted to testify, and does testify in conflict with his answer, it will not do to hold that his testimony shall be disregarded and his answer stand wholly unimpeached. Precisely how far the rule should be modified, now that a party may be a witness in his own behalf, it is not necessary at present to indicate. We see no reason to dissent from the conclusion of the master, that no deed was ever executed by Nathan Smith for the share in question.

Nor do we discover any error in his conclusion that no such exclusive possession was taken by Newbold in pursuance of the

[Spencer and Newbold's Appeal.]

contract as to take the case out of the Statute of Frauds.  As
trustee before the sale he paid the taxes on the land.  They were
unseated and no one was in actual possession.  He merely contin-
ued to pay the taxes as before.  No change of possession was
taken in consequence of his purchase.  Payment of the purchase-
money alone is insufficient to take the case out of the statute.  At
most, however, this was a purchase by one tenant in common of
the interest of his co-tenant.  There can be no valid parol sale of
lands among tenants in common in possession, as there cannot be
any such delivery of possession as will take the case out of the
statute : Workman *v.* Guthrie, 5 Casey 495 ; Chadwick *v.* Felt,
11 Id. 305 ; Hill *v.* Meyers, 7 Wright 170 ; McCormick's Appeal,
7 P. F. Smith 54.  Nor was there any such actual, hostile, con-
tinued and exclusive possession in Newbold, as to give him title
under the Statute of Limitations.

It therefore follows that at the time of his purchase from Mrs.
Smith he had no right to this share which he could enforce at law
or in equity against the heirs of Nathan Smith.  He held the
share as land in trust for them, until the sale to the company.
Thenceforth he held the stock and proceeds thereof in like manner.
Primâ facie the purchase of a trustee from his *cestui que trust*
cannot stand.  To sustain it the trustee must have acted in entire
good faith.  He must show that he made to the *cestui que trust*
the fullest disclosures of all he knew in regard to the subject-mat-
ter, and that the price he paid was adequate : Coles *v.* Trecothick,
9 Vesey 234 ; Randall *v.* Errington, 10 Id. 423 ; Greenfield's Es-
tate, 2 Harris 489 ; Diller *v.* Brubaker, 2 P. F. Smith 498 ;
Wistar's Appeal, 4 Id. 60 ; Parshall's Appeal, 15 Id. 224.

A reference to the evidence shows that Newbold did not inform
Mrs. Smith that he had ever held this property in trust for her
late husband ; nor that he had purchased it from Mr. Smith ; nor
that he and William M. Spencer had conveyed it to the Black Creek
Improvement Company, and had received in payment therefor,
stock of large value ; nor that coal mines were being worked on
the land, and that a cash dividend had been declared on the stock.
It is true he did say to her that Mr. Spencer had some valuable
coal interests in lands which he (Newbold) and Mr. Smith had for-
merly owned, and he was desirous of removing some doubts about
his title ; that he wanted to get quit claim deeds from her and
from the heirs of her husband, and her release of dower, for which
he would pay something.

He then withheld the substantial facts, which would have shown
that she and the heirs of her late husband had a clear right to the
property and its great value.  His whole language was manifestly
intended to convey, and did convey to Mrs. Smith, the idea that
their interest was small and of uncertain value.  At this time she
was past eighty-six years of age.  The vigor and strength of her

mind were impaired. She possessed limited means; hence the persuasive kindness of Newbold to pay her money so soon, was well calculated to prevent suspicion, and cause her to refrain from making inquiries of others. She was thus induced to procure for Spencer the title of the heirs, and transfer her own and all, for not more than one-seventh of its value. Spencer knew by the quit-claim deed which he received from Newbold, that Smith had executed no deed for the lands. In making the contract with Mrs. Smith, Newbold acted for both Spencer and himself. Each had full knowledge. Both were interested in the stock issued for this share. Spencer therefore stands on no higher ground than his agent and co-partner. Substantially the same concealments and suggestions procured the deeds from the heirs. Manifestly such a purchase cannot be sustained in equity. It is unnecessary to discuss all the collateral questions in detail. We see no error in the conclusion of the master nor in the decree of the court.

Decree affirmed, and the appeal of each party is dismissed at the cost of the appellant therein.