JONES v. BYRNE et al.

(Circuit Court, W. D. Arkansas, Texarkana Division. November 12, 1906.)

1. SPECIFIC PERFORMANCE—PRINCIPLES GOVERNING.

The specific performance of a contract is not a matter of absolute right, but rests in the judicial discretion of the court, to be exercised in accordance with the principles of equity, and a specific performance will not be decreed where it would be inequitable.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Specific Performance, §§ 17, 18.]

2. SAME—CONTRACT FOR PURCHASE OF LANDS—BREACH OF TRUST BY PURCHASER.

Complainant, who was a resident of Massachusetts, purchased certain notes secured by vendor's liens on lands lying in Arkansas and Texas near the line between them, and defendant, who was a lawyer, residing near the lands, became the owner of the legal title subject to such liens. Prior to maturity of the notes, the parties entered into a written contract, by which defendant agreed to look after the lands, free them from liens, and do whatever was necessary to render them marketable, and to sell the same in his discretion; complainant agreeing to release his lien on any part so sold. The proceeds of any such sales, after deducting expenses incurred by defendant, were to be applied on the liens until they were extinguished: and the contract provided that any land remaining should belong to the parties equally. During a number of years defendant looked after the lands and made some sales, but complainant realized nothing therefrom. After a time defendant commenced negotiations for the purchase of complainant's interest, making offers which he increased from time to time until he finally telegraphed an acceptance of an offer which had been made to him by one acting in complainant's behalf. Prior to such acceptance he had entered into a contract with his codefendants for the sale to them of one-half in value of the lands in consideraation of their furnishing the money to buy complainant's interest, but such contract was not disclosed to complainant. *Held,* that the contract between the parties constituted defendant both attorney and trustee for complainant with respect to the lands and imposed on him the duty of fully disclosing all the facts relating thereto before he could make a valid contract for their purchase, and that, conceding that a contract otherwise valid was made by his telegram, it was in violation of his trust, and would not be specifically enforced.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Specific Performance, § 173.]

3. COURTS—FEDERAL COURTS—PROPER DISTRICT FOR SUIT—CANCELLATION OF INSTRUMENTS—NATURE OF SUIT.

A suit for the cancellation of a contract for the sale of land is one in personam, and may be brought in a district other than that in which the land is situated.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 809.]

4. CANCELLATION OF INSTRUMENTS—PERSONS AGAINST WHOM SUIT WILL LIE—CONTRACT IN BREACH OF TRUST.

A contract for the purchase of land made with the holder of the legal title, in violation of his duty as trustee, for the owner of an equitable interest therein, will be canceled at suit of the latter, where the purchasers had knowledge of his interest.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Cancellation of Instruments, § 47.]

5. COURTS—JURISDICTION OF FEDERAL COURTS—SUIT AFFECTING LANDS IN ANOTHER STATE.

A federal court is without jurisdiction to decree the foreclosure of a lien upon, and to order a sale of, land which is situated in another state.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 809.]

6. VENDOR AND PURCHASER—VENDOR'S LIEN—RIGHT TO ENFORCE—VIOLATION OF TRUST AGREEMENT BY DEFENDANT.

Complainant, who was the owner of notes secured by a vendor's lien upon lands entered into a contract with defendant who had purchased the legal title by which defendant was to take charge of and sell sufficient of the lands to pay the lien notes, the remainder, if any, to be owned by the parties equally. No time of performance was fixed nor for the duration of the contract. After several years, defendant attempted to purchase complainant's interest without disclosing material facts, and did other acts in violation of his trust and in fraud of complainant's rights. *Held,* that complainant was entitled to a foreclosure of his lien.

## In Equity.

The bill of complaint in this case is not voluminous,· but the answer and cross-bill are long, rambling, argumentative. and evidentiary, and the answer to the cross-bill necessarily long. The material facts are few, and, in the main, not in dispute. There is some conflict in the evidence on points not essential to the correct determination of the case. No effort will be made to set out the substance of the pleadings, or the evidence in full. The substantial facts are these: On the 27th of December, 1889, W. L. Whittaker and wife sold to A. C. Jones, B. T. Laws. and R. A. McKee, the lands in controversy, and the latter gave to said Whittaker, for the unpaid balance of the purchase money, their 10 promissory notes, amounting, in the aggregate, to $5,250. The notes bear 10 per cent. interest. The notes are described correctly in the bill, and, upon some of them, payments have been made. Whittaker and wife executed a deed to said purchasers, which was duly recorded, and contained a description of the notes, and reserved a vendor's lien to secure the same. Before maturity, for value, and in the regular course of business, Whittaker assigned the notes to the complainant, Erastus Jones. The lands for which the notes were given, by mesne conveyances, became vested in the defendant Lawrence Byrne. On the 2d day of June, 1892, the complainant, Jones, and the defendant Byrne entered into the following agreement:

"Whereas, under and by virtue of a series of conveyances, namely two deeds from W. L. Whittaker and wife to A. C. Jones, B. T. Laws, and R. A. McKee. under date the 27th day of December, 1889, and under deeds from said Jones, Laws, and McKee to the Miller Hardwood Lumber Company, and bearing date 9th day of July, 1890, and by virtue of two other deeds from said Miller Hardwood Lumber Company to L. A. Byrne, bearing date 1st day of June, 1891, he the said L. A. Byrne owned the legal title to the following tracts of land, to wit: All that certain tract of land lying about five miles north of Texarkana, and known as the 'Texas and Pacific survey, No. 1,' the same containing 640 acres of land, it being the same tract of land surveyed by virtue of certificate 2/1254 issued to the Texas & Pacific Railroad Company, by the Controller of the General Land Office of Texas August 27th, 1874, and patented March 4th, 1877, which land is situated in Bowie county, Texas (also S. E. ¼ of the S. W. ¼ of section 25; the fractional half of section 30: all of fractional section 31; the S. E. ¼ of the N. E. ¼ the S. E. ¼; of the S. E. ¼ the west half of the east half and the west half of section 32; all of section 33; all in township 14, range 28, Miller County, Arkansas, and containing 2,023.63 acres more or less.

"And, whereas, under the sale from W. L. Whittaker and wife to said Jones, Laws. and McKee, a balance of the purchase money is not yet due, which are evidenced by purchase money notes, and that shortly after the sale of the said land by said Whittaker he transferred all of said purchase money notes to Erastus Jones, who is now the owner and holder of same, and that it is estimated there is an aggregate of about $5,000.00 due upon said notes to said Erastus Jones, which amount, however, is subject to vary upon a complete settlement between the parties.

"And, whereas certain payments have been made to W. L. Whittaker since the sale made by him which were intended as a payment upon said notes, but the said Whittaker has failed and neglected to turn said payments over to the said Erastus Jones.

"And, whereas there are certain expenses which must necessarily be incurred in clearing the titles to said land and placing the same upon the market, such as redemption from taxes, litigation now pending, surveying, and mapping the same, and any other expenses that may be absolutely necessary to place the same upon the market. No charge shall be made by said Byrne for time in the sale of the land, or for attorney's fees to him:

"Now, therefore, it is agreed between L. A. Byrne and Erastus Jones as follows:

"That the said L. A. Byrne, in order to facilitate the making of deeds in case of sale of said land, the legal title thereof shall remain in his name, that he shall have the right, and he is hereby empowered with authority to incur

all necessary expenses to place said land upon the market; and he is further empowered with authority to make all sales of said land, and, in case of sale said Erastus Jones, will relinquish his vendor's lien on that of the land sold.

"That out of the proceeds of any and all sales of the land, the expenses of preparing the same for market shall first be paid.

"(2) The proceeds arising from the sale of said land shall next be applied to the payment of the balance of the purchase money now due Erastus Jones until all of said purchase money is paid.

"(3) Then after the balance due said Jones for purchase money is paid, the remainder of the land or the proceeds thereof shall be owned and possessed by said Jones and Byrne equally.

"(4) It is further agreed that the money collected by the said W. L. Whittaker, and owing by him, which should go as a payment upon said purchase money notes, shall be applied to the payment of said notes when collected.

"(5) It is further agreed that in case of sale of any of said land made by said L. A. Byrne, and for the payment of which he shall take notes, that the same shall be assigned by him to said Erastus Jones as a payment on the purchase money notes held by him, in which case the said Erastus Jones waives and relinquishes his vendor's lien under the original notes to that part of the land sold by said Byrne, and accept the latter purchase money notes of the tract or tracts sold by said Byrne in lieu thereof.

"Witness our hands this second day of June, 1892.

"L. A. Byrne.<br>"Erastus Jones."

Later, while the above agreement was in full force, defendant Byrne, without the knowledge or consent of the complainant, entered into a contract with his codefendants, which is as follows:

"February 11th, 1905.

"For, and in consideration that Louis Heilbron, M. C. Wade, and J. O. Stribling will furnish the money, cash, to purchase the interest of Erastus Jones in certain lands, of which the lands herein named are a part, I agree to deed to said parties the following tracts for said consideration:

"All that part of section 1, Texas & Pacific survey, lying west of right of way of K. C. S. Railway, and south of center of the channel of McKinney Bayou, in Bowie county, Texas.

"All that part of fractional W.½ of section 30, lying north of center of McKinney Bayou.

"Also W. ½ of W. ½ section 32; S. ½ of S. E. ¼ of S. W. ¼ of section 32; S. ½ of S. E. ¼ of section 32; S. E. ¼ of N. E. ¼ of section 32.

"All that part of N. E. ¼ of N. E. ¼ of section 32, lying west of center of McKinney Bayou.

"Also W. ½ of the S. E. ¼ of section 3e; S. ½ of the S. W. ¼ of section 33k; N. E. ¼ of the S. W. ¼, except 5 acres of section 33; W. ½ of the N. W. ¼ of section 33.

"But, in case the interest of Erastus Jones in said land cannot be purchased for less than $7,500.00, which is the sum he asks, then said Byrne is to add the E. ½ of E. ½ of section 33 to the above land.

"L. A. Byrne.

"Accept the above proposition.

"J. O. Stribling.<br>"M. C. Wade.<br>"Louis Heilbron."

Under the contract of June 2, 1892, Byrne entered upon the discharge of his duties, instituting some suits and defending others, paying taxes, redeeming some of the lands which had been forfeited for delinquent taxes, and generally clearing up the titles. Some of the taxes he paid with money furnished by Jones; some, presumably, he paid with his own means, without any authority in the contract, or from Jones, dehors the contract. He also began improving the land, leasing it to tenants, building houses, collecting rents and carrying on farming operations. He sold some of the land, and took notes therefor, and collected some purchase money. Some of the notes for the

purchase money were turned over to Jones, and, later, returned to Byrne; but it does not appear that Jones ever realized a cent on his purchase-money notes, nor that any detailed and accurate statement of Byrnes' doings in regard to the land was ever furnished Jones at any time, before or since the institution of this suit. Indeed, it does not appear that any such accounts were kept. Jones resided in Massachusetts, was far advanced in years, never saw the land, knew nothing personally of its actual value, or the condition of the titles. For all this he depended on Byrne. On the 11th of November, 1899, Byrne, by letter, which will appear in the opinion in full, endeavored to induce Jones to divide the land, and, to that end, wrote him: "The way I figure is that you own about two-thirds and I own one-third. The land is worth about $15,000.00 and your two thirds is worth $10,000.00. If you will hold it for five years it will be worth $20,000.00, as the land is increasing in value." Jones declined to divide. In 1904, possibly earlier, Byrne began negotiations to buy Jones' interest in the land, and for this interest, which he represented in 1899, was worth $10,000.00, and if Jones should hold it five years would be worth $20,000, he offered Jones, first, $4,000, then $5,000, then $6,000, then $7,000, and, finally, $7,500. Before Byrne made the offer of $7,500 for Jones' interest in the land, he had bargained to sell about half the land for $7,500 to his codefendants, as shown by the agreement of February 11, 1905, and studiously kept that fact a secret, and never did disclose it until the original bill had been prepared, to enforce the foreclosure of the vendor's lien notes. The bill is to foreclose said notes, cancel the agreement of February 11, 1905, and compel an accounting. The cross-bill is for specific performance, based on the alleged acceptance of Byrne of an offer of Bemis to sell Jones' interest in the land for $7,500.

The facts above stated are undisputed. Other facts, considered of importance, will be found in the opinion.

McRae & Tompkins, for complainant.

W. H. Arnold and L. A. Byrne, for defendants.

ROGERS, District Judge (after stating the facts). Logically, the cross-bill in this case, which is for specific performance, should be considered first, because, if the complainant is compelled to convey the lands in controversy to defendant Byrne, he is not entitled to a decree enforcing his vendor's lien, and his amended bill should be dismissed. In Hennessey v. Woolworth, 128 U. S. 442, 9 Sup. Ct. 109, 32 L. Ed. 500, Mr. Justice Harlan, speaking for the court, said:

"Specific performance is not of absolute right. It rests entirely in judicial discretion, exercised, it is true, according to the settled principles of equity, and not arbitrarily or capriciously, yet always with reference to the facts of the particular case. Willard v. Tayloe, 8 Wall. 557, 567, 19 L. Ed. 501; Marble Co. v. Ripley, 10 Wall. 339, 357, 19 L. Ed. 955; 1 Story's Eq. Jur. § 742; Seymour v. Deancy, 6 Johns. Ch. (N. Y.) 222, 224. The question in cases of specific performance, Lord Eldon said, is not what the court must do, but what, under the circumstances it may do, in the exercise of its discretion to grant or withhold relief of that character. White v. Damon, 7 Ves. 30, 35; Radcliffe v. Warrington, 12 Ves. 326, 331. It should never be granted unless the terms of the agreement sought to be enforced are clearly proved, or, where it is left in doubt whether the party against whom relief is asked in fact made such an agreement. Colson v. Thompson, 2 Wheat. 336, 341, 4 L. Ed. 253; Carr v. Duval, 14 Pet. 77, 83, 10 L. Ed. 361; Huddleston v. Briscoe, 11 Ves. 583, 591; Lanz v. McLaughlin, 14 Minn. 72 (Gil. 55); Waters v. Howard, 1 Md. Ch. 112, 116."

The doctrine stated is believed to be, not only sound, but universally recognized by courts of equity. It is the doctrine of the Supreme Court of Arkansas (Ft. Smith v. Brogan et al., 49 Ark. 309, 310, 5 S. W. 337). It follows that the peculiar facts of this case must be

inquired into. In a great measure the decision of this case depends on the proper construction of the contract between complainant and defendant of June 2, 1892. What status was established between the parties by that contract? Before the contract was executed they were at arms length; neither owed the other any duty, and neither had assumed any obligations to the other. The plaintiff had the right to enforce his vendor's lien against the land on the maturity of his notes, and cause it, or so much as was necessary, to be sold to satisfy the same. The defendant Byrne had the right to pay the notes, and thereby release the land of the vendor's lien, but he was under no obligation to do so. Byrne had paid, as surety, $5,000 for other parties, and those parties had conveyed land to Bryne, subject to the vendor's lien, to reimburse him for the money he had so paid for them. Naturally Byrne wanted to realize something to that end. The titles to the land were defective, and it was desired by both parties that they should be perfected. If sold while imperfect, the complainant might reasonably fear that they would not bring the amount of his debt, and he would have to buy them in and perfect the title afterwards. He lived in a distant state (Massachusetts), and was himself advanced in years. Naturally he would be glad to avoid that contingency. On the other hand, Byrne was a lawyer, living only a few miles from the land, and, being interested to realize something to reimburse him for his loss, could readily look after the perfection of the titles, and would naturally not want to sell if any of the titles were imperfect, lest they fail to bring the amount of complainant's debt, and he should sustain a total loss. Such were the conditions out of which grew the contract under consideration. The contract is loosely drawn, and is unlawyerlike, but I do not think it difficult of construction in this regard.

As we shall see later, we are aided by the correspondence of the parties before there were any differences between them. Before the contract was executed the complainant had no interest in the land itself. He had only an equitable vendor's lien upon the land. Byrne held the legal title, so far as the complainant was concerned, for he had acquired such title as Whittaker, who was the payee of the notes, had at the time of selling the land and taking the notes; but, by this contract, Byrne, in consideration of plaintiff's forbearance to enforce his vendor's lien on the land, undertook to do three things: First, to attend to all suits pending in which the lands were involved, without compensation; second, he was to perfect the title, sell the land, and pay off the notes of the complainant, without pay; third, after the notes were paid, the contract says: "The remainder of the land or the proceeds thereof shall be owned or possessed by said Jones and Byrne equally." A more critical examination of the contract will be made later. Now, the only thing under consideration is the legal status created by the contract between the parties to it. Nothing can be clearer than that the relation of attorney and client was created, and there was a valid consideration for the contract. Was the relation of trustee, and cestui que trust created? That depends upon the proper construction of the contract. The legal effect of the contract was this: Byrne was to

hold, as before, the legal title to all the land, and this was done as a convenience, to facilitate the making of deeds when sales were made. He was to be the agent and attorney for perfecting the titles, either by litigation in the courts or by redemption from tax sales and the like, and for preparing and placing the land on the market and selling the same, and was authorized to incur the necessary expense thereof. When sales were made the proceeds were to be used, first, for defraying the expenses referred to; second, to pay off the notes of complainant; third, the remainder of the land or the proceeds thereof to be the property of Jones and Byrne equally.

The contract expressly provides that when Byrne sold lands Jones was to "relinquish his vendor's lien on that of the land sold," and the last provision of the contract is that if lands are sold and notes taken, the same should be assigned to Jones as a payment of the purchase-money notes to be held; and, in that event Jones "waives and relinquishes his vendor's lien as to that part of the land sold," and was to accept the new notes in lieu of the old. It is clear Jones did not intend by the contract to surrender his vendor's lien, except upon such of the lands as were sold in pursuance of the contract. But, in addition to the interest he held before the execution of the contract, he acquired by the terms of the contract, an equal interest in the remainder of the lands after his notes were paid. This was the condition of things when negotiations began for Byrne to purchase Jones' interest in the lands. Was Byrne a trustee for Jones? He was both agent and attorney; but was he also trustee? Did he hold anything real or personal under the contract for Jones, and in such way as to make him trustee for Jones? "A trust in the most enlarged sense in which that term is used in English jurisprudence may be defined to be an equitable right, title, or interest in property, real or personal, distinct from the legal ownership thereof." 2 Storys' Eq. Jur. par. 964. A trustee, in the widest meaning of the term may be defined to be a person in whom some estate, interest, or power in or affecting property of any description is vested for the benefit of another. Hill on Trustees, p. 46; Emmert v. De Long, 12 Kan. 67; Truesdale v. Philadelphia Trust Co., 63 Minn. 49, 65 N. W. 133; Burnet v. Bookstaver, 10 Hun (N. Y.) 48. "Express trusts are those which are created by the direct and positive acts of the parties by some writing, or deed, or will. Not, that in those cases, the language of the instrument need point out the nature, character, and limitations of the trust in direct terms, ipsissimis verbis; for it is sufficient that the intention to create it can be fairly collected upon the face of the instrument from the terms used, and the trust can be drawn, as it were ex visceribus verborum. Implied trusts are those, which are deducible from the nature of the transaction, as a matter of clear intention, although not found in the words of the parties; or which are superinduced upon the transaction by operation of law, as matter of equity, independent of the particular intention of the parties." By the terms of this instrument Byrne had the authority to sell the land, fixing the prices without consultation with Jones. He did that very thing in more than one instance under the contract. Doubtless Jones thought Byrne's personal interest, which

depended upon the payment of the lien notes, coupled with the fact that Jones had, by the terms of the contract agreed to release his vendor's lien in case of sales, was a sufficient guaranty that Byrne would sell for the best price that he could obtain. It was his interest to do so; for, to get anything out of the land himself, he had to look to what was left after the lien notes were paid. Jones reposed this confidence in Byrne by the very terms of the contract. He reposed in Byrne the confidence to clear up the title, to prepare the land for market, survey and map it when necessary, and the like, and to incur the necessary expense to do it, using his own judgment, and without even conferring with Jones. Byrne did these very things. Jones reposed in him the additional confidence of holding, in his own name, the remainder of the land after the expenses referred to, and the lien notes, were paid, and of selling the same and dividing the proceeds between them. The latitude given Byrne in the management of the land, and so as to enable him to realize something for himself, was very wide, both as to the time in which the trust was to be discharged, the authority to clear up the title and prepare the lands for sale, as well as to conduct the necessary litigation, and the expenses within the powers conferred by the contract, were to be incurred in that respect solely in Byrne's discretion. The relation, therefore, was one of great confidence and responsibility, requiring the utmost candor and good faith, and clearly made Byrne a trustee for Jones.

Let us consider the law governing the relation of attorney and client, and of trustee and cestui que trust when dealing with each other as to the subject-matter of the litigation or trust while those relations subsisted. In 4 Cyc. at page 960, the author says:

"Owing to the confidential and fiduciary relation between an attorney and his client and to the influence of the attorney over his client growing out of that relation, courts of law, and especially of equity, scrutinize most closely all transactions between an attorney and his client. To sustain a transaction of advantage to himself with his client, the attorney has the burden of showing, not only that he used no undue influence, but that he gave his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been had the client dealt with a stranger."

In note 81, same page, it is said:

"It is obvious that this relation must give rise to great confidence between the parties, and to a very strong influence over the actions and rights and interests of the client. The situation of an attorney or solicitor puts it in his power to avail himself, not only of the necessities of his client, but of his good nature, liberality, and credulity, to obtain undue advantages, bargains, and gratuities. Hence, the law, with a wise providence, not only watches over all the transactions of parties in this predicament, but it often interposes to declare transactions void which, between other persons, would be held unobjectionable." Story Eq. Jur. Par. 310 (quoted in Gruby v. Smith, 13 Ill. App. 43, 45).

See, also, Gray v. Emmons, 7 Mich. 533, 548.

The text is sustained by the decisions of 15 states and the federal court. "An attorney can in no case, without the client's consent, buy and hold, otherwise than in trust, any adverse title or interest, touching the thing to which his employment relates, or put himself in an adverse position." Id. p. 958, par. 2. "It is the duty of an attorney to make

known to his client any interest he may have in the matter concerning which he is employed, to be faithful to the interests of his client, and to render correct accounts where he is called upon to account. To make proper payments of money belonging to his client is also the duty of an attorney where the payment falls within the scope of his employment." Id. p. 957, § 1. In Hill on Trustees, p. 217, it is said:

"In all these cases the title to equitable relief will of course be much stronger, where several fraudulent ingredients, such as the imbecility or distress of the parties, or inadequacy of price, etc., are to be met with together in the same transaction. It is from the collection of such facts, as was remarked by Lord Thurlow, that it is to be made out and evidenced, that fraud or misrepresentation was used. Wherever, from the peculiar relations or connection existing between the parties, considerable authority or influence necessarily exists on the one side, and a corresponding reliance and confidence is placed on the other, a party will not be suffered to abuse this authority or influence by extracting from it any advantage to himself. But the court will look into transactions between persons in these relative situations with extreme jealousy: and, if it find the slightest trace of undue influence used, or unfair advantage taken, will interpose, and give redress. Indeed, in some of these cases, as for instance, in dealings between guardian and ward, trustee and cestui que trust, or attorney and client, the transaction is in itself considered so suspicious, owing to the near connection between the parties. as to throw the proof upon the person who seeks to support it, to show that he has taken no advantage of his influence or knowledge, but has put the other party on his guard, bringing everything to his knowledge which he himself knew."

In Ludington v. Patton, 86 N. W. 580 the Supreme Court of Wisconsin said:

"No rule is better established than that, if a trustee, or a person standing in relations of trust and confidence to another, deal with the cestui que trust, or such other in respect to the subject of such trust, for his own benefit, or that of others whom he represents, serving two persons at the same time. in form, when, in contemplation of law he can serve but one loyally, the transaction cannot be upheld, if called in question by the cestui que trust, unless the trustee is able to prove to the satisfaction of the court, by clear and satisfactory evidence, that the two were at arm's length in the transaction, that no confidence was reposed in him by the beneficiary, that the bargain was profitable to the beneficiary, and that he was fully informed in regard to the value of the property and the nature of his interest in it. Beach, Trusts, § 518; Puzey v. Senier, 9 Wis. 370; Roller v. Spilmore, 13 Wis. 29; Barker v. Barker, 14 Wis. 131: Cook v. Woolen Mill Co., 43 Wis. 433: Davis v. Dean, 66 Wis. 100, 26 N. W. 737; Creamer v. Ingalls, 89 Wis. 112, 61 N. W. 82: Disch v. Timm, 101 Wis. 179, 77 N. W. 196; Saunders v. Richard, 35 Fla. 28, 16 South. 679, 685; Spencer's Appeal, 80 Pa. 317; Brown v. Cowell, 116 Mass. 461; In re Hodge's Estate, 63 Vt. 661. 22 Atl. 725; Cole v. Stokes, 113 N. C. 270, 18 S. E. 321; Mills v. Mills (C. C.) 63 Fed. 511; 1 Story, Eq. Jur. § 321. The policy of the law is to regard all transactions of a contract nature, between a trustee and his cestui que trust, whereby the former obtains the interest of the latter, or some part thereof, in the subject of the trust, as presumptively fraudulent and void at the election of the latter. If such a transaction be permitted to stand, it is upon condition that the trustee satisfies the court, fully and completely, that the cestui que trust received a full equivalent for that which he parted with, and that the transaction was to his advantage rather than to his disadvantage. The burden of proof in such a case rests upon the trustee to clearly free himself from the imputation of fraud arising from the facts, and the same is true where a person deals to his own advantage with a person with whom he sustains relations of trust and confidence. The obligation of disclosure, and to protect the interests of the weak or trusting, is the same in one case as the other. 'It is the language of all the authorities that such a transaction is always scrutinized in a court of equity with a watch-

149 F.—30

ful eye, and will not be sustained to the disadvantage of the cestui que trust, except upon the most complete and satisfactory evidence of good faith and fair dealing on the part of the trustee.'" Puzey v. Senier, 9 Wis. 376.

At page 581 of the same case, it is said:

"The trustee must show, 'by unimpeachable and convincing evidence that the beneficiary, being sui juris, had full information and complete understanding of all the facts concerning the property and the transaction itself, and the person with whom he was dealing,. and gave a perfectly free consent, and that the price paid was fair and adequate, and that he made to the beneficiary perfectly honest and complete disclosure of all the knowledge and information concerning the property possessed by himself or which he might, with reasonable diligence have possessed.' 2 Pom. Eq. Jur. § 958. 'A trustee may buy from the cestui que trust, provided there is a distinct and clear contract, ascertained to be such after a jealous and scrupulous examination of all the circumstances, providing that the cestui que trust intended the trustee should buy, and there is no fraud, no concealment, no advantage taken by the trustee of information acquired by him in the character of trustee'—that the trustee took no advantage whatever of his situation, and that he gave his cestui que trust all the information which he possessed. Lord Eldon, in Coles v. Trecothick, 9 Ves. 247."

In the case of Robertson v. Chapman, 152 U. S. 681, 14 Sup. Ct. 741, 38 L. Ed. 592, Robertson, who lived in Maryland, employed Chapman & Polk, attorneys residing in Plattsmouth, Neb., to sell certain properties belonging to the estate, of which Robertson was trustee. Polk, one of the firm, instead of selling the land for all it would bring, arranged with O'Donohue to buy it for him, and it was done, O'Donohue conveying the property the day he got his deed. The court say:

"What is the case as to the defendant Polk? It is not to be doubted that the relations between himself and the plaintiff in respect to the sale of this property, were those of agent and principal. He was precluded by the position voluntarily assumed by him from taking advantage of his principal, or from dealing with the property committed to his care in any other capacity than as an agent, who was bound to subordinate his own interests to those of his principal. He could not, directly or indirectly, become the purchaser and maintain any title thus acquired as against his principal; for, in so purchasing, his duty and his interest would come in conflict. If an agent to sell effects a sale to himself, under cover of the name of another person, he becomes, in respect to the property, a trustee for the principal, and at the election of the latter, seasonably made, will be compelled to surrender it, or, if he has disposed of it to a bona fide purchaser, to account not only for its real value, but for any profit realized by him on such resale. And this will be done upon the demand of the principal, although it may not appear that the property, at the time the agent fraudulently acquired it, was worth more than he paid for it. The law will not, in such case, impose upon the principal the burden of proving that he was, in fact, injured, and will only inquire whether the agent has been unfaithful in the discharge of his duty. While his agency continues, he must act, in the matter of such agency, solely with reference to the interests of his principal. The law will not permit him, without the knowledge or assent of his principal, to occupy a position in which he will be tempted not to do the best he may for the principal."

Apply these principles to the case at bar. At the very moment that Byrne offers to pay complainant $7,500 for his interest in the land, he, Byrne, had been offered by his codefendants that sum for about half of the land in value. I say about half—the record is in that shape that no one can tell from it how much he contracted to sell, or how much was left. The proof leaves it so the part contracted by Byrne to his code-

fendants was worth more than the part left—how much more, nobody can tell—but I infer from the proof very little more. Byrne says the contract for that sale was executed a day or two after he offered to pay the $7,500 for Jones' interest, but he says also that the offer was based on an oral agreement of his codefendants to take the land at that price, and that he had them execute the agreement, so as to bind them, a day or two later. When the instrument was executed makes no difference. He had their offer to take the land at $7,500, and that at the very time that he sent his telegram of acceptance to Bemis to purchase the land at that sum, and his telegram was based upon the offer of his codefendants, so made. It is this alleged agreement that Byrne based his telegram of acceptance on, that he now asks the court to compel Jones to carry out. This offer of his codefendants to give $7,500 for the land was not communicated to Jones, or his agent, Bemis, and the authorities above cited show that it was Byrne's duty to give Jones all the information about the land that he had. Can it be inferred that Jones would have sold his interest for $7,500 had he known it? Byrne had been trying to buy Jones' interest for several months, perhaps a year, prior to March 28, 1905, which is the date of his telegram, first offering $4,000, then $5,000, then $6,000, and then $7,000. This agreement with his codefendants was made after $7,000.00 had been refused by Jones. The agreement with his codefendants was prepared by Byrne himself. The first paragraph says:·

"For, and in consideration, that Louis Heilbron, M. C. Wade, and J. O. Stribling will furnish the money cash to purchase the interest of Erastus Jones in certain lands, etc., I agree to deed to said parties the following tracts [describing them]."

### The last paragraph says:

"In case the interest of said Erastus Jones cannot be purchased for less than $7,500, which is the sum he asks, then said Byrne is to add the E. ½ E. ½ section 33 to the above land."

But Jones did not know of this offer by Byrne, or that his codefendants had under consideration the purchase. Evidently on February 11, 1905, when Byrne drew the instrument he had made up his mind to buy the land from Jones for $7,500, if he could not get it for less, provided his codefendants would put up the $7,500, for he was willing to give up the additional 160 acres to secure the bargain, if he could not get Jones to take less. It was Byrne's duty to make the land bring every dollar he could, and to protect Jones' interest under the contract; but, on the contrary, he was trying to buy it as cheaply as he could. In order to do so, he was keeping to himself these material facts, which the law imposed on him the duty of telling Jones. Byrne proceeded upon the theory that because Bemis was Jones' agent, that he was absolved from his duty as attorney, agent, and trustee of Jones. In this he was mistaken. His trust was alive, and his duties in no sense modified or altered. His position was flagrantly inconsistent. He had agreed with Jones to represent him in selling, but he was also trying to buy from Jones, to use his own language, "by diplomacy and by bluffing," to get the land for the least possible figure. His personal

interest brought him in direct antagonism to his duty as trustee. He seems to have laid much stress upon the fact that Jones had Bemis for his agent to·sell, and that he had invited Bemis to visit the land and see for himself its condition and value. He knew that neither Bemis nor Jones had ever seen the land, but if they had known all about the land, had been just as familiar with it, as Byrne was, still they were entitled to know, when Byrne came to purchase from Jones, everything that Byrne knew which would be of any importance to Jones in determining the price. But the invitation to Bemis did not absolve Byrne from any duty the law imposed on him, as attorney, agent, or trustee for Jones. The truth is the evidence fails to show that Bemis was Jones' agent at all, for any purpose, until the 8th of December, 1904, when he gave him the power of attorney. He was Jones' relative and friend, and, prior to the execution of the power of attorney, had acted as such, advising him when called upon about the land; but he had no authority to bind him, and did not try to do so. The power of attorney was defectively acknowledged and inadequate to bind Jones to any contract affecting the title to the land. Jones was not therefore bound by any representations Byrne made to Bemis; certainly not as to this land prior to the execution of this power of attorney. But if he had been, as stated, the duties the law imposed on Byrne, as trustee, remained unaltered, and without modification, notwithstanding Bemis' agency. Byrne was forbidden by law from dealing with his cestui que trust until he had put his cestui que trust in full possession of all information about the property, which he, Byrne, had in his own possession. This he never did do at any time, and even now this record does not disclose full information. It is unprofitable to examine the evidence further. Specific performance should never be granted under such conditions.

Another reason why no specific performance can be had, even assuming Bemis as agent for Jones had the power to sell the lands, is that the telegram of March 28, 1905, is not an acceptance of any offer made by Bemis. It is notice only that Byrne had "finally decided to accept" the offer, not that he had accepted it, or did accept it. The letter and inclosures forwarded by Byrne the next day injected new and other conditions never referred to in any of the correspondence, and this was tantamount to a rejection of Bemis' offer, assuming he had made one, and the tender of a new proposition by Byrne to buy, which Bemis had the right, and did refuse. It is unprofitable to discuss this matter, and I content myself with citing authorities. Hennessy v. Woolworth, 128 U. S. 438, 9 Sup. Ct. 109, 32 L. Ed. 500; Couch v. McCoy (C. C.) 138 Fed. 702, and cases there cited; James v. Darby, 100 Fed. 224, 40 C. C. A. 341, and cases there cited.

Another reason why specific performance will not be granted is that:

"Where the contract sought to be enforced is infected with fraud, misrepresentation or bad faith, equity will not lend its aid to its enforcement." 26 Am. & Eng. Enc. Law, p. 45, par. 71, and cases cited in footnote 4.

Another reason is that:

"It is well settled that a court of equity will refuse to enforce an unconscionable contract, or one whereby the party seeking a decree would obtain

an unconscionable advantage over the other contracting party." Id. p. 68, and cases cited in footnote 6.

The cross-bill should be dismissed for want of equity.

We now come to the consideration of complainant's amended bill. Enough has been stated to show that the contract between Byrne and his codefendants cannot stand; indeed, Byrne's codefendants wisely disclaimed. They could not have defended the suits for its cancellation, because the law holds them to a knowledge of all that is contained in the contract between Jones and Byrne, and that contract, in the light of their evidence, and that of Byrne, advised them that Byrne was acting in violation of his trust. Indeed, their contract with Byrne disclosed that fact, because, on its face, it appears that Byrne was trying to buy Jones' interest for the lowest price he could; whereas, the law imposes upon him the duty of making the land bring all it would. Every man is presumed to know the law, and Byrne and his codefendants must be held to have known it. Enough has been said to show that the case at bar is one falling clearly within the jurisdiction of a court of equity. The objection to the amount involved is insufficient—proceeds upon a mistaken theory of the case, and does not merit discussion. It is contended, also, that a part of the land lays in Texas, and that this court cannot deal with that—certainly cannot enforce the vendor's lien. The question is a serious one, so far as the Texas land is concerned. The court undoubtedly had the right, if necessary, to cancel the contract for its sale made between Byrne and his codefendants, for, to that extent, the action is in personam; but to enforce the vendor's lien, or to enforce the contract between complainant and Byrne, by a decree directing the sale of land through its master or commissioner, which lies in another state than that in which the court rendering the decree is held, is quite a different thing. Such an action is in rem. Pennoyer v. Neff, 95 U. S. 734, 24 L. Ed. 565. Counsel for complainant insists that the question is settled by the case of Muller v. Dows, 94 U. S. 445, 24 L. Ed. 207. To this the court cannot assent. That was a case covering railroad properties, lying partly in two states, and complainant filed his bill to foreclose the same in a Circuit Court of the United States, sitting in one of the states, and prayed a decree for the sale of all properties in both states. The decree was made and on appeal affirmed, but on facts peculiar to that class of property, and of circumstances widely different from those at bar. There it was one mortgage and one trustee, and the lien was created by one instrument, recorded, of course, in both states, and it was property that could not be sold in parts without destroying its value; it was an exception to the general rule. In the case at bar, five of the notes aggregated $3,750, and are a lien on the Arkansas land, secured, presumably, by a recitation in the face of one deed, and the other four notes are a lien on the Texas land, and secured, presumably; by a recitation in the face of another deed, and, in each case, the notes were executed for the balance due of the purchase money of the respective bodies of land. Muller v. Dows, moreover, has not been followed in the later decisions, for now the practice is to file ancillary bills in such cases in all the jurisdictions where the property lies. Another and earlier case of interest

is that of Massie v. Watts, 6 Cranch, 148, 3 L. Ed. 181, where Chief Justice Marshall reviews the English decisions and entertains jurisdiction, but that was a case of enforcing a trust by compelling an agent, who had entered in his own name lands which it was his duty to enter for his principal, and to convey them to his employer. He simply compelled him to convey, although such entry was in another state than where the court sat. In that case, other cases are cited in the English Chancery Courts, which fully warrant the foreclosure of a mortgage on land in another jurisdiction than that in which the court foreclosing the mortgage was sitting. Teller v. Carteret, 2 Ves. 494. This question, I think, was practically settled adversely to the complainant in Boyce v. Grundy, 9 Pet. 288, 9 L. Ed. 127. There a decree was rendered by the Circuit Court of the United States for the District of West Tennessee, in an action for rescinding a contract, and for an accounting. The contract was rescinded, and a personal judgment entered and made a lien on certain lands in Mississippi, and they were ordered to be sold to satisfy the lien. The court said:

"Another objection is to that part of the decree, which creates a lien upon the land in controversy, lying in another state, and decrees a sale for the discharge of the lien. We are of opinion that the decree is erroneous in this respect. In the first place, the court had no jurisdiction to decree a sale to be made of land lying in another state, by a master acting under its own authority."

The case at bar does not fall within any of these cases except the last, and I have not been able to find any decision overruling or establishing different doctrines than that declared in Boyce v. Grundy, supra. Inasmuch as Byrne's codefendants have entered a disclaimer to all the land, both in Arkansas and Texas, the bill, so far as it relates to the land lying in Texas, will be dismissed for want of jurisdiction to grant the relief sought, and without prejudice to the complainant to pursue any remedy he may elect in any court of competent jurisdiction to enforce any claim he may have against the Texas land, described in the bill of complaint herein. It remains to be considered to what relief complainant is entitled as to the Arkansas land. Enough has been said in the discussion of the cross-bill to show that the defendant Byrne acted under the contract in violation of his trust. Without reference to what may have been his motive, whether good or bad, he totally misapprehended his duty, and violated his trust. Indeed, he seems, under a misconstruction of the contract, to have deliberately and purposely violated it. It is recited, in the fourth paragraph of the contract, as follows:

"And, whereas there are certain expenses which must be necessarily incurred in clearing the titles to said land, and placing the sale upon the market, such as redemption from taxes, litigation now pending, surveying and mapping the same, and any other expense that may be absolutely necessary to place the same upon the market."

And in the following paragraph it is recited:

"Now, therefore, it is agreed between L. A. Byrne and Erastus Jones as follows, that the said L. A. Byrne, in order to facilitate the making of deeds in case of sale of said land the legal title thereof shall remain in his name, and that he shall have the legal right, and he is hereby empowered with author-

ity to incur all necessary expenses to place said land upon the market, and he is further empowered with authority to make all sales of said land and in case of sale said Erastus Jones will relinquish his vendor's lien on that of the land sold, that out of the proceeds of any and all sales of the land the expenses of preparing the same for market shall first be paid; second, the proceeds arising from the sale of said land shall next be applied to the payment of the balance of the purchase money now due Erastus Jones until all of said purchase money is paid."

There is no other provision contained in this contract which authorized Byrne to incur any expense of any character in connection with the sale of this land than those paragraphs I have quoted; and yet it seems that under this contract Byrne has sold some tracts of land and used a part of the money to pay taxes and part to build houses and clear land, and entered upon a general policy of farming operation upon such parts of the land as he could get tenants to go upon. He says in his testimony that both Bemis and Jones knew this. Jones and Bemis both deny it. Jones says that at different times he received information that Byrne had or was about to sell lands, but that the notes or purchase money not being sent to him, he was under the impression that the sales had fallen through; that he had never received any statement of Byrne's action in the premises, and when called upon by Byrne to furnish money to fence the whole land, he declined. Byrne insists that in the correspondence it appears that statements were furnished, but it does not satisfactorily appear to the court that any statements were ever furnished, until about the time Byrne began to negotiate for the purchase of the land. Then some imperfect statements were rendered to Bemis, and immediately upon the furnishing of these statements friction arose, and controversy over this land between Bemis and Byrne began. This was perhaps as late as 1904. Byrne insists that Jones knew that he was improving the land, and made no objection; but there is a wide difference, having regard to the relations of the parties, between Jones knowing that Byrne was clearing and improving the land, and that of his, authorizing Byrne to sell land and use the proceeds to make improvements. Jones thought, no doubt, that Byrne expected to get from the rents such money as he advanced for the improvements, and this could not reduce Jones' security; indeed, it improved it. But Byrne insists that his farming operations were disastrous, and that Jones knew he was engaged in farming, and spending money, etc., and did not object, and therefore the land is chargeable with his losses. No letter from Byrne to Jones (they never met each other) informed him of such claim, or understanding, has been produced. Byrne, in a letter of January 16, 1899, did advise Jones that he was leasing the land two, three, and four years to get it cleared, and spoke of revenue to be derived from it, but not that the proceeds of the land was to be used to clear it. Another letter, dated November 11, 1899, is in evidence, which is significant. It is as follows:

"Texarkana, Arkansas, Nov. 11th, 1899.

"Mr Erastus Jones, Spencer, Mass.—Dear sir: I write you some information concerning our land interest. Collected $48.00 of the nigger, Levi Marshall, on the 40 acres sold him. Shall I keep it to pay taxes, or send it to you. I brought suit against B. F. Cody to foreclose vendor's lien against the land bought by him. I had another tenant on a small improvement on the

land, but he made no crop and I lost personally on this negro. Bought him a horse, furnished him with supplies, and he now owes me over $100.00. I'll change this fellow for a better one. I am anxious to open up a farm on this land which will require an expenditure of money and would like for us to agree on a division of the land. The way I figure is that you own about two-thirds and I own one-third. The land is worth about $15,000.00, and your two-thirds is worth $10,000.00. If you will hold it for five years it will be worth $20,000.00, as the land is increasing in value. If you will consent to a division, I will agree to see after your interest, pay taxes, and collect rents without charge. I will agree to take the 640-acre tract in Texas in the division. There is going to be some litigation over this tract, but I will take the chances in this. There is about 2,680 acres in the several tracts and they join at the state line. My object is not to get any advantage in this division, but to get my part, so I can improve it. Give this matter your consideration, and write me.

  "Truly yours,              L. A. Byrne."

It would seem, from this letter that Byrne was seeking a division of the land, so he could improve his own part of it; not that he was using the money from the sales of the land to improve the remainder of it. November 4, 1899, in a letter, Jones declined to divide, saying he was "not prepared to give an opinion at present." The only other letter of Jones disclosed in the record which is significant as to leasing land and clearing land except the one refusing to furnish the money to place a wire fence around all the land, is as follows:

                 "Spencer, Mass. June 5th, 1897.

"L. A. Byrne, Texarkana, Arkansas.—Dear sir: In reply to your letter of recent date, I think it would be well to lease if there is an opportunity, but I should not care to take an interest in the business myself. Should be very glad to know if the land could be so shaped as to afford an income, and hope that you may be able to accomplish that.

  "Yours truly,              Erastus Jones."

So it appears Jones specifically declined to take an interest in Byrne's farming, fencing, and leasing operations. Byrne also insists that the contract of June 2, 1892, was changed by the parties, so that he was to have a larger share in the land. The details of the change, he says, were not agreed upon, but it was understood that on a settlement that it should be of an equitable nature, having regard to the nature and character of his services, and trouble in managing the land, which had far exceeded that contemplated by the parties when the contract was made. If such understanding was had, it was with Bemis, and long before he held Jones' power of attorney. This claim rests on Byrne's evidence alone, and is vague and unsatisfactory. There is nothing in writing in the record to show it, and both Jones and Bemis flatly deny it. Bemis disclaimed any power or authority to alter the contract. That claim of Byrne's must fail. Without prolonging the discussion, it is enough to say that the contract of June 2, 1902, must control the relations between the parties. Byrne then had no right, under the contract, to use the proceeds of the land for any other purpose than that stated in the contract of June 2, 1902. He certainly had no right to use any portion of it in clearing land or in his farming operations, nor had he the right to use it for payment of attorney's fees, unless authorized by Jones. Byrne owned the equity of redemption in the land, and it was his duty primarily to pay the taxes; but by the contract of June 2, 1892, Jones became entitled, after his lien notes were paid, to one-

half of the land remaining, or its proceeds, and should therefore pay one-half the taxes. Byrne, as the owner of the equity of redemption, had the right also to clear the land, build houses on it, and carry on his farming operations on it on his own account. He could not, under the contract. And therefore neither Jones nor the land was chargeable with his losses or expenditures in that regard. If he made money by his farming operations, it did not go to Jones. If he advanced his own money in that regard, and the rents did not reimburse him, it was his own lookout. If he leased the land for a long term of years to get it cleared up and put in cultivation, it neither injured the land or Jones, and the knowledge of Jones that he was so doing did not make Jones responsible for Byrne's doings in that behalf. Indeed, as early as 1897, Jones declined to go into that business, as he had also declined to furnish money to fence land. Assuming that Byrne intended no wrong, his whole course of conduct in selling lands, and using the proceeds for other purposes than those specified in the contract; in failing to turn over the deferred purchase-money notes to Jones, as the contract required; in attempting to purchase Jones' interest in the land, as shown by the contract with his codefendants; his not advising Jones that he was selling for the same sum he offered Jones for his interest, about half the land, thereby making clear for himself the balance of the land, whereas the contract required him to pay out of the land the lien notes, the principal and interest of which was far in excess of the price he offered Jones, and then give Jones half the remainder of the land—were all violations of his duty to Jones, and of his trust under the contract, and amounted to a legal, if not an actual, fraud.

It is in just this class of cases that courts of equity will interpose, and afford a complete remedy and full relief to the injured party. The contract between Byrne and his codefendants, a copy of which is set out in the bill of complaint, will as to the Arkansas lands be canceled. The lands which lie in Arkansas will be sold to pay off the purchase-money notes held by Jones, together with all accumulated interest thereon, and the surplus to be disbursed as equity requires. An account must be had between Jones and Byrne, on account of the land, and the case will be referred to the standing master, C. B. Moore, who will be governed in stating it by this opinion as far as applicable, and the following instructions:

(1) He will allow the complainant, Jones, the face of the notes given for the balance of the purchase money for the Arkansas lands, together with the accumulated interest to date of report, less any proper credits that he shall find to exist, if any.

(2) He will charge him with nothing not provided for in the contract of June 2, 1892, as interpreted by this opinion, unless it shall be made to appear that outside of the contract he expressly authorized Byrne to make the expenditure under such conditions that he did not expect it to be returned to him.

(3) He will charge Byrne with the purchase price of such land as has been sold and paid for, less any payments made to Jones, and any expenditures made by him under the contract as herein interpreted, plus all expenditures made by him, if any, which were expressly authorized or ratified by Jones, which were not provided for in the contract,

and not intended by both parties to be returned to Jones on a sale of the land.

(4) He will cause Byrne to account for any unpaid purchase-money notes not turned over to Jones, as the contract required.

(5) He will take no account of the rents and profits on the land, or the leases thereof, or of any expenditures made on such account by Byrne, unless he shall find. that Jones expressly authorized such expenditures, outside of the contract, in which event such last-named amount shall be charged against Jones.

(6) He will inquire into and report his conclusions of law and fact, in regard to the payment of taxes, and redemption of lands from tax sales, and all money expended by Byrne in clearing up the title of the lands in Arkansas.

(7) He will ascertain the exact status of any lands sold by Byrne under the contract of June 2, 1892, and report his conclusions of law and fact thereon.

(8) He will ascertain and report to the court what amount on account of vendor's lien notes for the land in Texas is due and unpaid.

(9) He will report his conclusions of law and fact as to any other matters in controversy between Jones and Byrne in regard to the Arkansas land, arising out of the pleadings herein, and make a full report to the court, adjusting the differences between the parties.

(10) The standing master, C. B. Moore, will be appointed commissioner to make the sale of such of the lands, without delay, as lie in Arkansas, and which have not been sold by Byrne in accordance with the contract of June 2, 1892; and he is directed to bring the money into court to be disposed of under the order of the court as equity requires. Jurisdiction of the case is retained with power to make all necessary orders in the future.